MARYJO COHEN, FREDERIC J. FRANSEN, and
EMANUEL J. KALLINA, II,
in their capacities as trustees of the Melvin S. Cohen
Trust for the Minneapolis Federation for Jewish Service,

                                                OPINION & ORDER

                    Plaintiffs,

        v.                                      16-cv-325-jdp

THE MINNEAPOLIS JEWISH FEDERATION,

                    Defendant.

In 1980, the Melvin Cohen Foundation created a trust to "benefit or carry out the charitable, education[al,] and religious purposes" of defendant Minneapolis Jewish Federation. Dkt. 132-1, at 2. For many years, the Federation distributed funds from the trust without incident, but the relationship between the Federation and the current trustees—plaintiffs Maryjo Cohen, Emanuel Kallina, and Frederic Fransen—has become increasingly acrimonious in recent years, leading to this lawsuit in which each side is suing the other on numerous grounds. (For the remainder of the opinion the court will refer to the plaintiffs as "the Trustees" and to the defendant as "the Federation.")

Jurisdiction is present under 28 U.S.C. § 1332 because the Trustees and the Federation are citizens of different states and the amount in controversy is greater than $75,000. The parties are seeking damages as well as declaratory and injunctive relief regarding a variety of issues about the purposes of the trust and the relative authority of the Trustees and the Federation over the distribution of funds. Both sides are also asserting claims for breach of fiduciary duty.

The Trustees have filed a motion for summary judgment on all claims and counterclaims, with the exception of the Trustees' breach of fiduciary duty claims. Dkt. 119. The Federation is seeking summary judgment on all claims. Dkt. 129.

The Trustees' view of the case rests on a fundamental misunderstanding of their relationship with the Federation. The Trustees see the Federation as a "conduit" through which they may support the charities of their choice, so long as those charities are not inconsistent with the Federation's basic purposes, as the Trustees understand them. Dkt. 159, at 6, 19, 23–24. But that view is inconsistent with the trust agreement, trust law, and the federal regulations that govern the trust. Under those sources of authority, serving the Federation is the primary duty of the Trustees, a duty the Trustees have breached in many ways.

For these reasons and those explained below, the court concludes that: (1) the original trust agreement did not give the Trustees the right to direct the Federation to donate the trust's annual gift to particular charities; (2) the Trustees are not entitled to substitute a new beneficiary; (3) the Trustees were not entitled to amend the agreement to give themselves more authority at the expense of the Federation; and (4) the Trustees breached their fiduciary duty to the Federation by appointing a new trustee without seeking input from the Federation or otherwise attempting to choose a trustee who would act for the benefit of the Federation. Disputed facts preclude summary judgment on the claims whether: (1) the Federation failed to distribute the trust's gifts as promised in 2005, 2006, and 2007; (2) Cohen used funds from the trust to pay an employee for work that was unrelated to the trust; and (3) Kallina charged the trust for legal services that were unrelated to the trust. The court will grant summary judgment to the Trustees on the Federation's claim under the Wisconsin Prudent Investor Act because that claim is untimely.

Also before the court is the Federation's motion to compel discovery. Dkt. 178. The court will grant this motion to require the Trustees to produce unredacted copies of legal invoices and to allow limited depositions of Kallina and Patricia Ellenson.

UNDISPUTED FACTS

## A. Preliminary issues

Before setting forth the undisputed facts, the court will resolve one dispute about the parties' proposed findings of facts and address some problems related to those submissions.

### 1. The Trustees' motion to strike the Federation's "second supplemental proposed findings of fact"

The court will grant the Trustees' motion to strike a new set of "supplemental" facts that the Federation submitted with its reply brief but without seeking court approval. Dkt. 172 and Dkt. 174. The parties had *two* opportunities to submit their own proposed findings of fact (once with each side's own motion for summary judgment and once in response to the opposing side's motion) and each side took advantage of both opportunities, along with submitting responses to the other side's multiple sets of proposed findings of fact. This court's summary judgment procedures do not allow parties to submit yet another round of proposed findings of fact with their reply brief.

The Federation's only justification for submitting new proposed findings of fact is that the Trustees submitted new declarations with their reply brief. But submitting evidence with a reply brief is not necessarily a violation of the court's procedures. For example, it is appropriate to submit new evidence in order to dispute evidence that the other side submitted with its opposition brief. The problem arises when a party makes new factual allegations that are not directly responsive to facts already in the case, as the Federation has done with its new

supplemental facts. The court has not considered new, nonresponsive facts that *either* side submitted with its reply briefs, regardless whether those facts were included in new proposed findings of fact or simply new declarations.

## 2. Problems with the proposed findings of fact

The court also notes two problems with the proposed findings of fact. First, the Federation repeatedly cited evidence that did not support the particular proposed finding of fact at issue. *E.g.*, Dkt. 171, ¶¶ 44–49, 53, 64, 66, 74, 82, 119–20. After the Trustees pointed out the problem in their responses, the Federation did not acknowledge the mistake but instead provided a boilerplate response that the Trustees' response "raises no genuine dispute of proposed fact, but rather responds with arguments on the merits or facts that are not directly responsive to the proposed fact." *Id.* In most instances, the Federation would then provide a different citation for the original proposed fact.

That was not an appropriate response. If a party's cited evidence does not support a proposed fact, the other side is entitled to object and it is not appropriate for the party to disregard the objection and simply provide a new citation in reply without seeking a stipulation from the other side or permission from the court to make corrections. In some instances, the Trustees anticipated what the Federation *meant* to cite and responded accordingly. But the court disregarded proposed facts when the other side did not have a fair opportunity to dispute the underlying evidence.

Second, in its responses to the Trustees' proposed findings of fact, the Federation often raised boilerplate objections without explaining why they applied. In many instances, it was clear that the objection did *not* apply. For example, the Federation consistently objected to any proposed finding of fact that relied on Cohen's testimony on the ground that she did not have

4

personal knowledge of the circumstances surrounding the creation of the trust, even when contemporaneous documents were also cited (sometimes the Federation's own documents) and even when the proposed fact had nothing to do with creation of the trust. *E.g.*, Dkt. 160, ¶ 69 (objecting on this ground to proposed finding of fact that cited contemporaneous letter to prove communication about trust's first annual gift to the Federation); *id.* ¶¶ 73, 78, 82, 84, 98, 102 (objecting on this ground to proposed facts about communications received from Federation).

In some instances, it was not even clear what the Federation's objection meant. For example, one boilerplate objection included the following language or something similar: "[the proposed fact is] disputed to the extent the proposed fact and cited evidence mischaracterize the document and statements contained therein." *E.g.*, Dkt. 160, ¶¶ 50, 108 and Dkt. 171, ¶¶ 25, 35–36, 54, 57. But the Federation did not explain *how* a particular proposed fact mischaracterized the evidence. *See also* Dkt. 160, ¶ 171 (objecting to proposed finding of fact about Maryjo Cohen's conduct and that cited Cohen's declaration on ground that "the cited evidence does not support the proposed fact with admissible evidence, but rather cites legal argument and characterization," without explaining basis for objection); *id.* ¶ 173 (objecting to proposed finding of fact that quoted Federation's own letter).

Although the court's procedures do not prohibit the use of boilerplate objections, the court discourages their use. When responding to proposed findings of fact, a party should consider carefully whether an objection applies and tailor its response to the particular proposed fact. The court disregarded objections to proposed findings of fact when the party failed to explain the grounds for the objection and the grounds were not otherwise clear.

## B. Parties

Maryjo Cohen, Emanuel Kallina, and Frederic Fransen are trustees of the Melvin S. Cohen Trust for the Minneapolis Federation for Jewish Service. (When the trust was created, the Federation was called the Minneapolis Federation for Jewish Service rather than the Minneapolis Jewish Federation.) The Trustees are citizens of Wisconsin, Maryland, and Indiana, respectively.

The trust was created in 1980 through the execution of a trust agreement between the Cohen Foundation and the three initial trustees: Melvin Cohen, Gerald Schwartz, and Stephen Lieberman. Wisconsin is the situs of the trust and the location of its business office. Melvin Cohen was a trustee from 1981 until his death in 2008, when his daughter Maryjo replaced him. (The court will refer to Melvin Cohen by his full name and to Maryjo Cohen as simply "Cohen.") Emanuel Kallina and Frederic Fransen became trustees in August 2015 and November 2015, respectively. The trust currently has approximately $70 million in assets.

The Federation is a nonprofit corporation. Minnesota is the Federation's state of incorporation and the location of its principal place of business.

The Federation's articles of incorporation in effect in 1980 identified two "purposes and objects":

> 1. To plan with and coordinate Jewish philanthropic, educational and communal activities and agencies; to foster cooperation among all Jewish organizations in the Twin Cities Metropolitan area; to engage in philanthropic, cultural and other group activities which will contribute to the welfare of Jews; to coordinate fundraising activities for local, national and overseas Jewish causes; to raise, collect and distribute funds for the advancement of the welfare of Jews, either directly or through presently or hereafter established agencies; to cooperate with the United Way of Hennepin County and with other intersectarian and communal groups engaged in promoting the welfare of the Twin Cities Metropolitan community, to the end that the

happiness, well-being and cultural life of the community may be enriched.

2. To receive, hold, invest, manage and disburse devises, bequests and gifts designated for the Federation's endowment fund or for any philanthropic fund under the control of the Federation; and to utilize the corpus and/or income of such bequests or gifts for charitable, religious or educational purposes in the Jewish or general communities which qualify as recipients of tax-deductible contributions under the United States Internal Revenue Code of 1954, as amended, and the applicable laws of the State of Minnesota.

As of 2006, the Federation broadened its purposes to include the following:

A. To serve as the central communal organization for the metropolitan Minneapolis Jewish Community;

B. By itself and in cooperation with other Jewish communal institutions, to preserve, enhance, and perpetuate Jewish identity locally, nationally, and through the world;

C. To foster and promote cooperation among and between Jewish organizations and communities throughout the Twin Cities metropolitan area;

D. To foster and promote understanding and cooperation between the Jewish and general communities;

E. By itself and in cooperation with other Jewish communal organizations, to plan, coordinate, and engage in Jewish philanthropic, educational, social, cultural, and other communal activities to preserve, enhance, and advance the welfare of Jews and Jewish communities wherever they may be;

F. To raise, collect, and distribute funds for the benefit and welfare of Jews and Jewish communities directly or through existing and future local, national, and overseas Jewish organizations and institutions; and

G. To cooperate with inter-sectarian and non-Jewish organizations promoting the goods and welfare of the general Twin Cities metropolitan community.

In addition to contributing to various causes directly related to the Jewish community,

the Federation has contributed to Planned Parenthood, the Minnesota Center for

Environmental Advocacy, Minnesota Public Radio, the University of Minnesota Foundation, Carlton College, and the Greater Twin Cities United Way. None of these contributions included funds from the trust.

## C. Summary of the trust agreement

Under the trust agreement, the basic purpose of the trust is to "benefit or carry out the charitable, education[al,] and religious purposes" of the Federation. Dkt. 132-1, at 2. *See also id.* at 4 ("All such uses [of the trust] shall exclusively benefit or carry out the charitable, educational and religious purposes of the Federation. . . ."). The agreement also expresses the settlor's intent that the trust qualify as a "supporting organization" under Section 509(a)(3) of the federal tax code. *Id.* at 2.

The agreement directs the Trustees to "distribute 'substantially all' . . . of the net income of the trust each year for the support of the foregoing purposes of the Federation" and it allows the Trustees to designate "a particular function, activity, or grant program of the Federation, for the benefit of which the trust's annual distribution, or any designated portion of it, shall be applied." *Id.* at 4. If the Trustees do not designate "any particular use" for the annual distribution, the Federation may treat it as an unrestricted gift. The agreement also sets out a process for appointing successor trustees and for amending or terminating the trust. The court will discuss relevant provisions of the agreement in more detail in the court's analysis of the parties' claims.

## D. Operation of the trust

### 1. 1981 to 2015

Beginning in 1981, the trust made an annual gift to the Federation. Each year, the trust would send the Federation a letter accompanied by a check. The Federation would then write

checks to different recipients. The parties have highlighted certain incidents that they contend are pertinent to the issues in this case, particularly the intent of the settlor and the genesis of the underlying dispute.

In November 1981, Melvin Cohen wrote to then-trustee Lieberman about his intent to "send[] a check to the Federation . . . with the usual instructions that the entire amount be dedicated to the Emergency Fund in Israel." Melvin Cohen also wrote that "some nominal sum might be carved out for another specific purpose, such as the Talmud Torah in Minneapolis." Dkt. 128-11.

In 1982, the trustees "request[ed]" that the Federation use a portion of the annual gift for the Torah Academy of Minneapolis, a Jewish lecture series at the University of Minnesota, and the Emergency Fund in Israel. Dkt. 128-28. The Federation agreed to comply with these requests.

In 1987, Melvin Cohen asked the Federation to use a portion of the annual gift for the National Workshop on Christian-Jewish Relations. The Federation agreed to make the donation.

In 1992, the trustees at the time "request[ed]" that the Federation use a portion of the annual gift for the Rachel Liba Cardozo Children's Foundation, which Melvin Cohen had created as a memorial to a family member who had died at a young age. In an internal memo, the Federation concluded that it could "[v]ery liberally justify the distribution" and it would "do whatever Mel Cohen wants," in part because "no one could talk Mel out of the recommendation and to attempt to do so would be counterproductive." Dkt. 128-34. The Federation distributed the money to the foundation as requested.

In 1997, Melvin Cohen wrote to the Federation that he was "most surprised" to learn that the trust was listed in the Federation's annual report as supporting a charity serving the Minneapolis community. He wrote that he believed that "all funds distributed to [the Federation], each year, are strictly for use in Israel." Dkt. 128-20, at 2. In response, the Federation wrote that its purpose was to "support activities for the 'Jewish community' wherever in the Jewish world these activities take place" and they suggested that the trust "earmark[]" particular contributions "for Israel." Dkt. 128-21. In another response, Melvin Cohen wrote, "as a suggestion only," that the Federation could create a category in its annual report called "Supporting Trusts With Funds Primarily Designated for Israel." Dkt. 128-22.

In 1998, the Federation donated money to Bridges for Peace—an organization devoted to improving relations between Christians and Jews—using funds from the trust and at Melvin Cohen's request. Dkt. 128-41. The Federation did not have a previous relationship with that organization.

In 1999, Melvin Cohen asked then-trustee Lieberman whether "we can direct up to $100,000 of our next remittance" for the Middle East Media & Research Institute (MEMRI), which Cohen stated "has effectively influenced the political debate and directed it to what should be of utmost importance viz., the intentions and motivations of the Arab side." Dkt. 128-43. The Federation informed Cohen that it determined that MEMRI was registered as a nonprofit corporation and the Federation would make the donation.

In 2002, Melvin Cohen asked the Federation to inform the trustees "of the ultimate distribution of the funds sent each year to the United Jewish Communities. While we know that presumably causes in Israel are the beneficiaries, we have no information as to what those causes may be." Dkt. 160, ¶ 58.

In 2004, Melvin Cohen "ask[ed]" that the Federation donate a specified portion of a $750,000 gift to MEMRI ($110,000), Bridges for Peace ($50,000), and the Torah Academy of Minnesota ($7,000). He also "ask[ed]" that the remaining portion be used for "apparent needs in Israel." Dkt. 132-12.

In 2011, the Federation agreed to an "emergency" contribution to MEMRI, using funds from the trust. Although the Federation stated that MEMRI "is not a beneficiary partner" of the Federation, the Federation agreed that "Israel is under siege, and in need of the tremendous work that MEMRI performs" and concluded that the donation was "within [the Federation's] mandate." Dkt. 128-26.

In 2013, the Trustees and the Federation had a dispute about then-trustee Harold Roitenberg's successor. The dispute was resolved by Roitenberg deciding to remain a trustee for the time being.

From 1981 until 2015, the Federation confirmed to the Trustees that it had honored every designation the Trustees made.

## 2. 2015 to the present

In March 2015, in accordance with a provision of the trust agreement, Roitenberg named Fransen as his potential successor, but Roitenberg did not step down at that time. Fransen did not have a relationship with the Federation and Roitenberg knew nothing about Fransen. Roitenberg chose Fransen because Cohen recommended him.

In November 2015, Cohen and Roitenberg provided a check on behalf of the trust to the Federation and designated for MEMRI. The Federation did not comply with the request to distribute the money on the ground that the Federation had "some questions" about the gift. Dkt. 160, ¶ 159.

During a November 24, 2015 telephone conference between the Trustees and Federation representatives, the parties discussed each side's relative authority to choose recipients for the trust's annual gift to the Federation. Without reaching agreement about the underlying dispute, the parties agreed to an in-person meeting in April 2016.

On November 30, 2015, Roitenberg informed Cohen's assistant that he was resigning. Cohen contacted Fransen to confirm that he would succeed Roitenberg as a trustee and to obtain approval for the distributions to the Federation, which were due that day. Cohen also spoke with Kallina to discuss designations for the trust. After that discussion, Cohen emailed Fransen with a list of proposed designations and Fransen approved the list in full.

The same day, the Trustees sent the Federation the trust's annual gift and a letter stating that the gift "should be distributed" to the various specified organizations in specified dollar amounts. Dkt. 133-25. Of the $2,425,000 designated, the Donors Trust, Inc. for the Jewish Education and Support Fund was to receive $1,693,500. That organization's website states that it is "the only fund committed to supporting and promoting the principles of liberty. We make grants to charities that do not rely on government funding but do promote the foundations of civil society: limited government, personal responsibility, and free enterprise." Dkt. 171, ¶ 90. The Donors Trust donor's guide states : "All grant recommendations are subject to approval by Donors Trust's Board of Directors (or its Officers acting on their behalf) and must be for grants to public charities that do not contradict Donors Trust's mission to promote liberty through limited government, personal responsibility, and free enterprise." Dkt.161. Cohen is a libertarian and the account holder of the Jewish Education and Support Fund at Donors Trust.

In response to Cohen's letter, the Federation wrote a letter that included the following passage:

> Some of your recommended distributions are for functions, activities or grant programs of the [Federation], and so we will of course make those distributions. Others are not but may be distributions consistent with the Federation's mission that the Federation is willing to make. The remaining funds will be distributed in accordance with the Federation's normal allocation process.

In a letter to the Federation dated December 9, 2015, Cohen stated that "[a]ll of the proposed distributions do in fact support both Jewish causes and the Federation's stated mission" and that the Federation "does not have the right or authority to alter the . . . designated charities." Dkt. 128-67. She asked the Federation to make the distributions or discuss any questions with the Trustees.

In a letter to Cohen dated December 15, 2015, the Federation expressed its willingness to meet with the Trustees to resolve their differences. In the meantime, the Federation stated that it was "holding the funds received from the Trust in reserve pending resolution." Dkt. 128-68.

In a letter to the Federation dated December 17, 2015, Cohen asked the Federation to identify particular designated charities to which it objected and to explain each objection. In a letter to Cohen dated January 11, 2016, the Federation listed the charities it approved and those it rejected, but it did not give reasons, instead stating that it had "multiple and varied reasons" that it would discuss with the Trustees if they wanted. Dkt. 128-70.

After Cohen sent another letter explaining her understanding of the mission of each of the rejected charities, the Federation again asked for a meeting with the Trustees and stated its position that the Trustees do not have the right under the trust agreement to designate specific

charities. It also explained its objections regarding each charity it rejected. In a letter dated February 2, 2016, Cohen wrote that she could not "comprehend [the Federation's] strained reading and interpretation of the English language." Dkt. 128-73. She asked the Federation to discuss all of the Trustees' designated charities at an upcoming Federation board meeting.

At the Federation's February 2016 board meeting, the board voted to have the trust's gift "held in reserve and not allocated to any beneficiaries until there is resolution of the issue concerning the relative authority of the Federation and the Trust to determine the allocation and the disagreements between the Federation and the Trust as to which organizations should receive the allocations." Dkt. 160, ¶ 189. In a letter dated February 19, 2016, the Federation informed the Trustees of this decision.

In February 2016, the Trustees voted to amend various provisions of the trust agreement, including the following:

- in Article IV, they added the sentence that a designation "may be made to any charity within the purpose of the Federation or the Federation's donor advised fund" and that the designation "need not be restricted to prior donee charities of the Federation";

- in Article VII, they removed any reference to a "Federation Trusteeship" and they removed the Federation's right to appoint a successor for that trusteeship when the outgoing trustee failed to choose one;

- in Article XI, they added a sentence that allows the Trustees to "elect" to become a private foundation; and

- in Article XI, they removed the requirement that amendments to the agreement be made "by unanimous agreement."

On April 19, 2016, the Trustees and three representatives of the Federation met in Eau Claire, Wisconsin. The Trustees did not tell the Federation that they had amended the trust

agreement or that they were planning to sue to remove the Federation as the trust beneficiary. The parties did not reach an agreement at the meeting and this lawsuit followed.

In November 2016, the Trustees made their annual gift to the Federation, again designating specific charities and amounts for each charity. Again, the Federation decided to hold the funds in reserve pending resolution of the parties' dispute.

## E. Trust finances

### 1. Trustees' investment strategy

The trust is "invested conservatively," mostly in treasury bills, certificates of deposit, and other fixed-interest investments. Dkt. 171, ¶ 39. Each year since 1981, the Trustees have provided the Federation the trust's financial statement, along with a copy of its income tax return and the Federation has acknowledged receiving this information. Dkt. 160, ¶¶ 76–79.

In April 2014, the Federation's chief financial officer analyzed the trust's gift history since 2011. He concluded that the "[t]he precipitous decline in the grant amounts is a function of the extremely conservative investment strategy followed by the Trust." Dkt. 160, ¶ 154. In a letter dated May 15, 2015, a lawyer for the Federation wrote that he "see[s] a need for a better diversification in the current investments of the Trust and a portfolio more likely to deliver income in amounts sufficient to make a minimum required distribution." *Id.* ¶ 152.

### 2. Patricia Ellenson salary

Patricia Ellenson provides accounting and other services for the trust and five other charitable organizations operated by the Cohen family. Fifty percent of Ellenson's compensation is allocated to the trust. In 2015, that amount was approximately $80,000.

After reviewing Ellenson's deposition testimony regarding the scope of her accounting work for the trust in 2015, the Federation's accounting expert concluded that the work was

worth approximately $20,000. Ellenson testified in her deposition that she "do[es] everything" for the Cohen family, including paying their bills and driving Cohen on long trips, Dkt. 110 (Ellenson Dep. 230:1–23), but the Trustees have provided no evidence that Cohen has allocated any portion of Ellenson's salary to the personal errands that she performs for Cohen.

### 3. Legal services

In 2014, the trust hired Kallina's law firm to perform legal services. Since then, Kallina has billed the trust more than $200,000 in legal expenses. The law firm bills submitted to the trust including the following line items:

- 7/24/15 Review and modify letter to BSA.

- 7/27/15 Email to Pat and Maryjo regarding letter from BSA.

- 8/6/15 Meet with Emil multiple times regarding treatment of present holdings for Cohen Supporting Organizations and private foundations and needed research regarding creation of Limited Liability Company.

- 9/4/15 Review 2% de minimis exception to excess business holding rules and current holdings of Presto Foundation, L.E. Phillips Family Foundation and M.S. Cohen Foundation.

- 10/13/15 Review and read all documents in Outlook and F'Work regarding Melvin Cohen Supporting Organization and Boy Scouts Supporting Organization in preparation for discussion with Emil.

- 11/20/15 Review DAF agreement of L.E. Phillips Family Foundation.

- 2/3/16 Review excess business holding code and regulations; work on summary of excess business holding issues concerning various Cohen/Phillips supporting organizations and private foundations.

- 2/10/16 Address pending issues facing Phillips Foundation, Cohen BSA, Cohen Trust, Cohen Foundation, etc.; conversation with Darren; plan out strategy.

- 2/15/16 Work on memorandum analyzing excess business holding issues among the various Cohen tax-exempt entities.

- 2/25/16 Work on draft of excess business holdings memorandum.

16

- 4/5/16 Review emails, file and Guidestar regarding the 6 Cohen charitable organizations; work on excess business holdings memorandum.

- 4/11/16 Work on draft of memorandum summarizing excess business holding issues affecting the various Cohen/Phillips charities.

- 4/12/16 Review 2012, 2013, 2014 Form 990s for L.E. Phillips Family Foundation, M.S. Cohen Foundation, L.E. Phillips Boy Scout Camp Trust, Boy Scout Camp Trust under the Will of L.E. Phillips and Presto Foundation.

- 4/13/16 Draft review and revise excess business holdings memorandum regarding Cohen and Phillips tax-exempt organizations; multiple email exchanges with Pat Ellenson regarding M.S. Cohen Foundation, Presto Foundation and L.E. Phillips Scout Camp Trust organization documents; review Melvin S. Cohen Foundation 9-18-2015 resolutions . . .second amendment to L.E. Philips Boy Scout Camp Trust Agreement and First & Second Amendment to same; review Presto Foundation 6-15-2015 resolutions, amended bylaws and pages 1 and 4 of articles of incorporation.

- 4/14/16 Draft review and revise excess business holdings memorandum regarding the Cohen and Phillips tax-exempt organizations; review email from Pat Ellenson regarding Presto Foundation and L.E. Phillips Family Foundation documents . . .

- 4/16/16 Draft, review and revise excess business holdings memorandum regarding Cohen and Phillips tax-exempt organizations.

- 4/18/16 Email exchanges with Emil and Russ regarding excess business holdings memorandum regarding Cohen and Phillips tax-exempt organizations.

The trust paid for all of this legal work.

## F. The Federation's handling of the trust's annual gifts

In a report prepared by an accounting firm hired by the Trustees, the firm reached the following conclusions: (1) from 2005 to 2007, the Federation failed to distribute funds as directed to the United Jewish Communities (UJC); (2) in 2006, the Federation used parts of the trust's annual gift to satisfy obligations to the UJC; (3) in 2002, 2008, and 2012, the Federation misclassified trust funds as "unrestricted;" and (4) from 2008 to 2011, the Federation pooled restricted and unrestricted funds.

In 2005, 2006, and 2007, the UJC confirmed that it received the dollar amount designated by the trustees.

## MOTION FOR SUMMARY JUDGMENT

### A. Overview of the claims.

Each side is asserting several claims, some of which are mirror images of claims asserted by the other side. Both sides ask the court to determine whether: (1) the Trustees have the authority under the original agreement to direct the Federation to distribute the trust's annual gift to particular charities; (2) the amended trust agreement is valid; and (3) Fransen was validly appointed as a trustee. Both sides are also suing each other for breach of fiduciary duty. Finally, the Trustees seek a modification of the trust agreement to substitute other organizations for the Federation and the Federation contends that that the Trustees violated the Wisconsin Prudent Investor Act. The court will address each claim in turn.

### B. Overview of the law

Three authorities are relevant to the parties' disputes: (1) the trust agreement itself; (2) federal law regulating the type of trust at issue in this case; and (3) the state law of trusts. Each of these sources helps inform the nature and extent of the duties the Trustees' owe the Federation. Because the Trustees repeatedly deny that they owe any duties to the Federation, it is important at the outset to explain why that view is incorrect.

#### 1. Trust agreement

The trust agreement is titled "Melvin S. Cohen Trust *for* the Minneapolis Federation for Jewish Service." Dkt. 132, at 2 (emphasis added). The agreement states in multiple places that the purpose of the trust is to further the purposes of the Federation. *Id.* at 2, 4. The

agreement also says that it cannot be amended in any way that "would alter the intention of the Donor[1] that this trust be operated for the benefit of the Federation." *Id.* at 9–10. These provisions show that the Federation is not simply a conduit through which the Trustees can make donations to charities of their choosing.

### 2. Federal tax law

The requirement on the Trustees to act in the Federation's interest is emphasized in the relevant tax law. The agreement is clear that it is to be interpreted in light of "Section 509(a)(3) of the Code." *E.g.*, *id.* at 2 ("[I]t is the desire of the Donor to establish a charitable trust [that] mak[es] distributions . . . in a manner qualifying the trust for recognition as a publicly supporting organization pursuant to Section 509(a)(3)."); *id.* at 3 ("[I]t is the intention of the Donor that this trust shall be 'operated in connection with,' as that term is defined in Section 509(a)(3) of the Code, the Minneapolis Federation for the Jewish Service, a publicly supported charitable organization."); *id.* at 10 ("[T]he Trustees shall make no amendment which would . . . adversely affect the trust's qualification under Section 509(a)(3) of the Code.").

Section 509(a)(3) of the federal tax code sets forth requirements for qualifying as a "supporting organization," which is a type of public charity. Other examples of public charities include churches, schools, and hospitals. 26 U.S.C. § 509(a)(1).

To qualify as a supporting organization under § 509(a)(3), the organization must be "operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of" a different organization called a "publicly supported organization." 26 U.S.C. § 509(a)(3)(A). The implementing regulation states further than the supporting

---

[1] The parties agree that "donor" means "settlor" in trust law parlance. Dkt. 171, ¶ 13.

organization may not "pay over any part of its income to, or perform any service for, any organization other than those publicly supported organizations specified in its articles." 26 C.F.R. § 1.509(a)-4(c)(3). The parties agree that the trust is a "supporting organization" and the Federation is a "publicly supported organization" under § 509(a)(3).

A supporting organization is subject to one of three types of oversight by the supported organization. The supporting organization must be: (1) "operated, supervised, or controlled" by the supported organization; (2) "supervised or controlled in connection with" the supported organization; or (3) "operated in connection with" a supported organization. 26 U.S.C. § 509(a)(3)(B)(iii). The parties agree that the trust agreement in this case adopts the third option. Dkt. 132-1, at 3.

To be "operated in connection with" a supported organization, a supporting organization must "provide[] to each supported organization such information as the Secretary may require to ensure that such organization is responsive to the needs or demands of the supported organization." 26 U.S.C. § 509(a)(3)(f)(1)(A). The "responsiveness" requirement is set forth in 26 C.F.R. § 1.509(a)-4. The regulation identifies three ways it may be satisfied:

> (A) One or more officers, directors, or trustees of the supporting organization are elected or appointed by the officers, directors, trustees, or membership of the supported organization;
>
> (B) One or more members of the governing body of the supported organization are also officers, directors, or trustees of, or hold other important offices in, the supporting organization; or
>
> (C) The officers, directors, or trustees of the supporting organization maintain a close and continuous working relationship with the officers, directors, or trustees of the supported organization.

26 C.F.R. § 1.509(a)-4(i)(3)(ii). The regulation also states that the supported organization must "have a significant voice in the investment policies of the supporting organization, the

timing of grants, the manner of making grants, and the selection of grant recipients by such supporting organization, and in otherwise directing the use of the income or assets of the supporting organization." 26 C.F.R. § 1.509(a)-4(i)(3)(iii).

The regulation does not define the term "significant voice," but it provides an example of a situation that satisfies the requirement and an example that does not. In the example showing compliance, the supporting organization and supported organization have quarterly meetings

> during which they discuss projected needs and ways in which [the supported organization] would like [the supporting organization] to use its income and invest its assets. Additionally, Trustee communicates regularly with that officer of [supported organization] regarding [the supporting organization's] investments and plans for distributions from [the supporting organization]. Trustee provides the officer of [supported organization] with quarterly investment statements, [other required information], and an annual accounting statement.

*Id*. In the example showing noncompliance, the supporting organization "makes annual cash payments to [the supported organization]. Once a year, Trustee sends to [the supported organization] the cash payment, [other required information], and an accounting statement. Trustee has no other communication with [the supported organization]." *Id.*

The obvious benefit of qualifying as a supporting organization (rather than a private foiundation) is reduced government scrutiny and regulation. *Polm Family Found., Inc. v. United States*, 655 F. Supp. 2d 125, 127 (D.D.C. 2009) ("Section 509(a)(3) organizations are exempted from private foundation status, and therefore excused from the extensive regulation of private foundations."). But the organization cannot avoid *all* oversight. The tradeoff is that the supporting organization accepts supervision by the supported organization. In other words, § 509(a)(3) rests on a premise that the IRS need not monitor the supporting organization as

closely as it otherwise would because the supported organization will reign in the supporting organization if it tries to depart from the purpose of the trust. *William F. Quarrie, Mable E. Quarrie & Margaret K. Quarrie v. Commissioner*, 603 F.2d 1274, 1277–78 (7th Cir. 1979) ("Supporting organizations are . . . excepted [from regulation] in so far as they are subject to the scrutiny of a public charity. The Treasury Regulations therefore provide that the supporting organization must be responsive to the needs of the public charity and intimately involved in its operations.").

Thus, § 509(a)(3) and § 1.509(a)-4 place important limitations on the discretion of the Trustees. These laws reinforce and emphasize the duties imposed on the Trustees in the trust agreement to serve the interests of the Federation.

### 3. Trust law

It is well established that "trustees have fiduciary duties to beneficiaries." *Wisconsin Med. Soc'y, Inc. v. Morgan*, 2010 WI 94, ¶ 66, 328 Wis. 2d 469, 503, 787 N.W.2d 22, 39. *See also* Wis. Stat. Ann. § 701.0801 ("Upon acceptance of a trusteeship, the trustee shall administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries, and in accordance with this chapter."). One of these is the duty of loyalty, which requires the fiduciary "to act solely for the benefit of the principal in all matters connected with the agency, even at the expense of the agent's own interests." *Zastrow v. Journal Commc'ns, Inc.*, 2006 WI 72, ¶ 31, 291 Wis. 2d 426, 446, 718 N.W.2d 51, 60 (internal quotations omitted). *See also id.* ¶ 28 ("A consistent facet of a fiduciary duty is the constraint on the fiduciary's discretion to act in his own self-interest because by accepting the obligation of a fiduciary he consciously sets another's interests before his own."); *Matter of Sensenbrenner*, 76 Wis. 2d 625, 635, 252 N.W.2d 47, 51 (1977) ("A trustee must . . . exercise diligence, prudence, and absolute

fidelity.") (internal quotations omitted); *Uniform Trust Code* § 802, Comment (2004) ("[T]he duty of loyalty [is] perhaps the most fundamental duty of the trustee.").

Flowing from the duty of loyalty is the duty of "fully disclosing to the beneficiary all information relevant to the beneficiary's interest." *Zastrow*, 2006 WI 72, at ¶ 29. *See also* Wis. Stat. Ann. § 701.0813(1) ("A trustee shall keep the distributees or permissible distributees of trust income or principal, and other qualified beneficiaries who so request, reasonably informed about the administration of the trust."); *Van Der Puy v. Van Der Puy*, 2009 WI App 27, ¶ 8, 316 Wis. 2d 412, 763 N.W.2d 559 ("A trustee who fails to make a full disclosure of material facts to a beneficiary or who personally profits from his or her role as a trustee breaches the trustee's duty of loyalty."). As will be discussed below, the Trustees' duty of loyalty and duty of disclosure play a key role in resolving the parties' disputes in this case.

The Trustees contend in their opening brief that they owe *no* fiduciary duty to the Federation because the Cohen Trust is a "charitable trust" and therefore does not have "definite beneficiaries." The trust is indeed a charitable trust, but like many charitable trusts, it has a beneficiary to which the Trustees owe duties. *Morgan*, 2010 WI 94, at ¶ 70 ("The existence of named beneficiaries is what transforms the Fund from money set aside for a purpose into a formal trust.").

Not surprisingly, in their reply brief, the Trustees drop their contention that they do not owe the Federation a fiduciary duty and they do not respond to the Federation's amply supported contention that it is a "qualified beneficiary" under Wis. Stat. § 701.0110 and that the Trustees owe duties to the Federation as a "supported organization" under federal tax law. In any event, because the trust agreement itself states that it is "for the benefit of the

Federation," and refers to the Federation as the trust's "beneficiary," Dkt. 132-1, at 10, it makes little sense to contend that the Trustees have no fiduciary duty to the Federation.

With these basic principles in mind, the court turns to the particular issues debated by the parties.

## C. The parties' relative authority over the distribution of funds

The parties agree that the Trustees must give the annual gift to the Federation, but they disagree about what must happen to the gift after that. The Trustees want a declaration and injunction that the Federation must distribute the trust's 2015 and 2016 gifts to the charities designated by the Trustees. The Federation wants a declaration that the trust agreement does not give the Trustees the right to designate funds to particular charities. The agreement is clear that the Federation is correct.

The parties recognize that a trust agreement is interpreted in accordance with general principles of contract law. The parties assume that Wisconsin law applies, so the court will do the same. *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 283 (7th Cir. 2002).

The objective is to determine the settlor's intent, but courts look to the agreement first to determine that intent. *Matter of Estate of Furmanski*, 196 Wis. 2d 210, 215, 538 N.W.2d 566, 568 (Ct. App. 1995). If the language of the agreement is unambiguous, it is controlling and "there is no need to look further to determine the [settlor's] actual intent." *In re McGuire Marital Tr.*, 2003 WI App 44, ¶ 10, 260 Wis. 2d 815, 824–25, 660 N.W.2d 308, 313.

### 1. Language of the agreement

The relevant provision in the trust states:

> The Trustees may, in their discretion, designate in writing to the
> Federation their selection of a particular function, activity, or
> grant program of the Federation, for the benefit of which the
> trust's annual distribution, or any designated portion of it, shall

be applied. Such designation, if any, need not be based on a recommendation of the Federation . . . .

Dkt. 132-1, at 4. This language resolves the dispute. The agreement gives the Trustees authority to select "a particular function, activity, or grant program of the Federation." It does not include the right to designate a particular charity.

The agreement does not define or list the Federation's functions, activities, and grant programs. But the Federation says that its "functions" are its purposes; Dkt. 171, ¶ 44; its "activities" are "things the Federation does itself to further its functions," such as conducting missions to Israel, operating the Harry Kay Leadership Institute and publishing "Minneapolis Jewish Life" magazine, *id*. ¶ 45; and its "grant programs" are programs in which it "fulfills its functions by granting funds to other organizations, or individuals, to carry out certain activities, including its Annual Campaign," *id.* ¶ 46.

The Trustees question the authority of the Federation's understanding of the terms, noting that the Federation was not involved in drafting the agreement and contending that the Federation's understanding has been inconsistent over the years. But despite all of these criticisms, the Trustees do not attempt to justify a contrary interpretation or otherwise challenge the substance of the Federation's interpretations. Construing the word "function" to mean purpose is also consistent with the settlor's stated intent in the agreement itself, which is to "benefit or carry out the charitable, education[al] and religious purposes of the Federation." Dkt. 132-1, at 2.

The Trustees contend that the agreement gives them the authority to choose "particular recipients," but there is no textual basis to support that view. The Trustees rely on the sentence in the agreement stating that their designations "need not be based on a recommendation of the Federation," but that sentence means only that the Trustees can choose any Federation

"function, activity, or grant program" they want; it does not expand the Trustees' authority to choose third-party charities.

Because the court has concluded that no reasonable reading of the agreement would support the Trustees' position, it is not necessary to consider any of the extrinsic evidence that the parties cite, such as the statements of Melvin Cohen.[2] The Trustees ask the court to consider the extrinsic evidence, citing Wis. Stat. § 701.0103(27), which defines the "terms of a trust" to mean "the manifestation of the settlor's intent regarding a trust's provisions as expressed in the trust instrument or as may be established by other evidence that would be admissible in a judicial proceeding." But this provision does not purport to elevate the status of extrinsic evidence in the context of a trust agreement. Rather, it simply confirms the common law rules for interpreting trust agreements, directing courts to rely on the language of the agreement or "other evidence that would be admissible in a judicial proceeding." Because extrinsic evidence is not admissible in a judicial proceeding in the absence of an ambiguity, that evidence is not admissible in this case. *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.").

The Trustees make other contentions that simply are not relevant to the questions before the court. For example, the Trustees contend that the Federation's purposes are so broad that "anything goes." Dkt. 137, at 27. But the disputed designations involve particular charities

---

[2] Even if reference to the intent of the settlor were needed to resolve ambiguity in the trust agreement, Mevin Cohen's statements would not be dispositive. The settlor is not Melvin Cohen, but the Melvin S. Cohen Foundation, which is itself a nonprofit corporation. Melvin Cohen's intent cannot simply be ascribed to the foundation he created.

not purposes, so it makes no difference in the context of this dispute how broad the Federation's purposes are.

### 2. Modification through course of conduct

Alternatively, the Trustees contend that the parties modified the agreement through their conduct to give the Trustees authority to direct the Federation to distribute the annual gift to particular charities. First, the trustees cite Wis. Stat. §§ 701.0412 and 701.0413, but both of those statutes relate to modification of a trust agreement by a *court*, not the parties, so those statutes do not apply to this claim. The Trustees cite no authority for the view that a court may modify the trust agreement under those statutes and make the modification retroactive.

The Trustees also cite *Nelsen v. Farmers Mut. Auto. Ins. Co.*, 4 Wis. 2d 36, 55, 90 N.W.2d 123, 133 (1958), which cited a treatise for the following standard to modify a contract: "Modification must be made by the contracting parties or someone duly authorized to modify, and one party to a contract cannot alter its terms without the assent of the other parties; the minds of the parties must meet as to the proposed modification." In a more recent Seventh Circuit opinion applying Wisconsin law, the court articulated a similar standard, stating that "[t]he existence of an agreement modifying a previous contract is established in the same way as any other contract" and that "[t]he acts relied upon to modify a prior contract must be unequivocal in character." *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 852–53 (7th Cir. 2005) (internal quotations omitted).

Neither side cites any authority in which this standard was applied to a trust agreement as the result of a course of conduct between the trustees and the beneficiary of the trust. As the Trustees point out in another context, the Federation is not a signatory to the trust

agreement. *Cf. Orth v. Wisconsin State Employees Union Counsel 24*, 546 F.3d 868, 873–74 (7th Cir. 2008) ("The prevailing although not unanimous view is that the *signatory* parties can alter the contract . . . .") (emphasis added). Because the parties do not address that issue, the court will assume as the parties do that the common law standard for modification applies and that a "meeting of the minds" between the Trustees and the Federation was necessary for the modification to occur. Under that standard, no reasonable jury could find that the parties modified the agreement in the way that the Trustees suggest.

The Trustees point to various instances in which the Federation agreed to distribute at least part of the annual gift to particular charities. But if this shows that the agreement was modified at all, it only shows that the parties modified the agreement to allow the Trustees to recommend particular charities to the Federation. The Trustees point to no situation in which the Federation agreed to distribute a gift to a charity over the Federation's objection. In fact, in correspondence, the Trustees consistently referred to designations as "requests" and the Federation referred to the designations as "recommendation[s]." *E.g.*, Dkt. 128-28 and Dkt. 128-34. The Federation's own view is confirmed by its practice of researching charities with which it was unfamiliar before approving the designation. If the Federation was of the view that it was required to accept the Trustees' recommendation, there would have been no point for the Federation to do anything other than distribute the money.

In their opposition brief to the Federation's motion for summary judgment, the Trustees contend that that the Federation "waived" its right to reject any of the Trustees' designations by consistently accepting them in the past. That is simply a repackaged version of the Trustees' modification argument and it relies on the same faulty premise that the Federation's conduct demonstrates a view that the Trustees had a right to designate any charity they wish.

Accordingly, the court will deny the Trustees' motion for summary judgment on this issue and grant the Federation's summary judgment motion.

### 3. The Federation's authority to place funds in reserve

The remaining question as to this claim is whether the Federation had the authority to hold the trust's 2015 and 2016 gifts in reserve pending resolution of the parties' dispute. The Trustees say that the agreement required the Federation to return the gifts if it failed to distribute the funds as the Trustees directed. They cite the following sentence in Article XI: "In the event that the Federation . . . is not then in existence or is unwilling or unable to accept the distribution. . . then the assets of this trust shall be distributed to an organization or organizations which are described in Section 501(c)(3) of the Code." Dkt. 132-1, at 10. The Trustees say that the Federation was "unwilling . . . to accept the distribution," so the money should have gone back to the trust.

The Trustees' argument is not persuasive. The section of the agreement the Trustees cite addresses situations in which the agreement will be "terminat[ed]." It does not relate to disagreements between the Federation and the Trustees over what to do with a particular gift. And the agreement consistently uses the words "distribute" and "distribution" to refer to the act of the Trustees giving the gift to the Federation, not the Federation forwarding the funds to particular charities. *E.g.*, Dkt. 132-1, at 4 ("The Trustees shall distribute 'substantially all' . . . of the net income of the trust each year . . . ."); *id.* (referring to "the trust's annual distribution"). Thus, the Federation *was* "willing . . . to accept the distribution" and did so. The agreement does not tell the parties what to do when they disagree about whether each side has complied with the terms of the agreement and the Trustees do not cite any other authority that would have prohibited the Federation from placing the funds

in reserve. Accordingly, the court concludes that the Trustees have failed to show that the Federation violated their rights as to this issue.[3]

## D. Trustees' authority to substitute a new organization for the Federation

The Trustees allege that the Federation has acted in ways that are so inconsistent with the purposes of the trust that another set of organizations should be substituted in its place. Although both sides moved for summary judgment on this claim, the Trustees say nothing about it in their opening brief. Regardless, the court need not decide whether the Trustees have forfeited their right to obtain summary judgment on this claim because the court concludes that the Federation is entitled to summary judgment.

In their brief in opposition to the Federation's motion for summary judgment, the Trustees again cite Wis. Stat. § 701.0412(1):

> The court may modify the administrative or dispositive terms of a trust or terminate the trust if, because of circumstances not anticipated by the settlor, modification or termination will further the purposes of the trust. To the extent practicable, the court shall make the modification in accordance with the settlor's probable intention.

The Trustees identify two reasons that circumstances have changed in a way that make it appropriate to substitute new organizations for the Federation: (1) the Federation has refused to give the trust's annual gift to the charities designated by the Trustees; and (2) the Federation has broadened its purposes to include support for "non-Jewish" organizations. The Trustees' first ground for making a substitution fails because the court has rejected their claim that the

---

[3] The parties do not raise and the court does not decide the question of how the parties are to resolve a dispute about whether a particular purpose chosen by the Trustees is a purpose of the Federation or whether a particular charity chosen by the Federation is an accurate reflection of that purpose.

Federation violated the trust agreement by refusing to distribute the trust's annual gifts to particular charities.

The Trustees' second ground fails as well. First, the trust agreement does not restrict the use of the money from the trust to "Jewish" organizations. In fact, apart from references to the name of the Federation, the word "Jewish" does not appear anywhere in the agreement. When the agreement refers to particular purposes of the trust it uses much more general language. *E.g.*, Dkt. 132-1, at 2–3 ("This trust is created and shall be operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, within the United States or any of its possessions."). The agreement does limit the trust to the purposes "of" the Federation, but the agreement does not place particular limitations on what those purposes must be or state that the Federation will forfeit gifts from the trust if the Federation changes its purposes.

Second, even if the court were to assume that the Federation could change its purposes in a way that would thwart the purposes of the trust, the Trustees have adduced no evidence that that has occurred. Although it is undisputed that the Federation has *expanded* its purposes to include more types of charities, the Trustees are not alleging that the Federation has turned its back on any of the charities that it funded at the time the trust was created. As the Federation points out, if the Trustees did not agree with the purposes of particular charities that the Federation funds, the Trustees were free under the terms of the agreement to earmark gifts for particular purposes with which the Trustees agree. Accordingly, the court will grant the Federation's motion for summary judgment on this issue and deny the Trustees' motion.

### E.  Validity of first amended trust agreement

In February 2016, the Trustees a drafted a new version of the trust agreement. The Federation challenges the legality of both the process the Trustees used and the following substantive changes: (1) permitting the Trustees to designate particular charities to receive the annual gift; (2) removing the reference to the "Federation Trusteeship" and the Federation's right to appoint a new trustee when the outgoing trustee fails to do so; (3) permitting the Trustees to elect to become a private foundation; and (4) removing the requirement that the Trustees agree unanimously to amend the trust agreement. Both sides seek summary judgment on this claim.

The court is persuaded that both the process of the amendment and the substance of the changes both violated the trust agreement as construed in light of federal tax law and breached the Trustees' fiduciary duties to the Federation. As to process, it is undisputed that the Trustees drafted the amended agreement in secret, without consulting the Federation. That is inconsistent with the Trustees' duty under 26 C.F.R. § 1.509(a)-4 and trust law to keep the Federation informed. Wis. Stat. Ann. § 701.0813(1); *Zastrow*, 2006 WI 72, at ¶ 29.

As to substance, it is clear that the purpose and effect of most of the amendments in dispute are to undermine the Federation and limit its influence over the trust. The addition of language permitting the Trustees to designate particular charities is obviously the direct result of the parties' dispute in the case. The amendment gives the Trustees more control over the distribution of the annual gift at the expense of the Federation, essentially allowing the Trustees to bypass the Federation and prioritize their own wishes over the Federation's. As for removing the reference to the "Federation Trusteeship," the Federation's right to appoint a new trustee when the outgoing trustee fails to do so, and the requirement that Trustees agree unanimously

to amend the trust agreement, the Trustees provide no justification for the amendments. But their purpose is clear from their effect, which is to further limit the influence of the Federation and give more control to the Trustees.

All of these amendments are inconsistent with the trust agreement, which prohibits amendments that "would alter the intention of the Donor that this trust be operated for the benefit of the Federation." Dkt. 132-1, at 9-10. Amendments that subordinate the Federation and elevate the Trustees are not "for the benefit of the Federation" under any reasonable reading of that phrase. The amendments are also inconsistent with the Trustees' duty of loyalty under trust law because they are attempts by the Trustees to act in their own interest rather than the interests of the Federation. *Zastrow*, 2006 WI 72, at ¶ 31.

Finally, the amended agreement states that, "if the Trustees shall so elect, the trust shall be treated as a private foundation under Section 509(a)(1) of the Code, with the same purposes as set forth in Article I." Dkt. 133-30, at 10. The Trustees do not dispute the Federation's contention that an organization cannot be both a private foundation under § 509(a)(1) and a publicly supporting organization under § 509(a)(3), so this amendment violates the trust agreement's prohibition on amending the agreement in a way that would "adversely affect the trust's qualification under Section 509(a)(3) of the Code." Dkt. 132-1, at 10.

The Trustees' response to this claim is that the wording of the amendment was not intentional and they "are prepared to" amend the agreement again to reflect their true intention of becoming a private foundation only if the trust "los[es] its tax-exempt status or its recognition as a publicly supporting organization." Dkt. 137, at 37. But the Trustees do not allege that they *have* amended the agreement again, so the claim is not moot.

In sum, the court concludes the amended agreement is defective, both procedurally and substantively. The Federation is entitled to summary judgment on this claim in all respects.

## F. Appointment of Frederic Fransen

Fransen became a trustee in November 2015 after his predecessor, Harold Roitenberg, resigned. Both sides seek a determination whether Fransen's appointment was legal.

Fransen was appointed to the fill the slot for what the trust agreement calls "the Federation Trusteeship." The relevant provision states:

> In the event of the death, disability, resignation or removal of Stephen K. Lieberman, that office, which shall be known as the Federation Trusteeship, shall be filled by Harold Roitenberg as his first successor Trustee. In the event of the death, disability, resignation or removal of Harold Roitenberg the next successor Trustee shall be Neil I. Sell. In the event that there are no successor Trustees who are willing and able to serve in such Trusteeship, the then acting Trustee in that office shall have the right to appoint his or her immediate successor. In the event of a vacancy resulting from a failure of a Trustee to appoint an immediate successor in the Federation Trusteeship, the Minneapolis Federation for Jewish Service shall appoint a successor Trustee.

Dkt. 132-1, at 8. Both Lieberman and Roitenberg were members of the Federation. Dkt. 171, ¶ 33.[4] Thus, this provision appears to reflect the policy of § 1.509(a)-4, which states that a supporting organization can show that it is "responsive" to a supporting organization if "[o]ne or more members of the governing body of the supported organization are also officers, directors, or trustees of, or hold other important offices in, the supporting organization."

The language of the trust agreement does not expressly require the "Federation Trustee" to be a member of the Federation or even to have a preexisting relationship with the Federation.

---

[4] Neil Sell declined to become a trustee. Dkt. 160, ¶ 130. The parties dispute whether he was a member of the Federation. Dkt. 171, ¶ 33.

And although the agreement gives the Federation a limited right to appoint the successor of the Federation Trustee, this is only when the outgoing trustee fails to name a successor. Because Roitenberg appointed a successor before he resigned, that provision does not apply. Similarly, § 1.509(a)-4 does not require that one of the trustees be a member of the Federation. Rather, that is one of three ways that the supporting organization can meet the responsiveness requirement.

But regardless of the language of the agreement or the regulation, a trustee's duty of loyalty to the beneficiary applies to choosing a successor trustee just as it applies to any other action by the trustee. It is undisputed that Fransen had no relationship to the Federation before his appointment. That in itself would not necessarily disqualify Fransen from acting as a trustee, but the Trustees' duty of loyalty required Roitenberg and any other trustee trying to influence him to choose a trustee who would act for the benefit of the Federation. Yet it is undisputed that Roitenberg had no basis for making that determination. He testified that he "never saw the man, never knew anything of him." Dkt. 171, ¶ 67. Rather, he chose Fransen because Cohen recommended him. Dkt. 128, ¶ 86. And Cohen does not provide any justification for her choice, let alone explain why she believed Fransen was a good choice for the Federation. The only fact about Fransen's background included in the parties' proposed findings of fact is that he "agrees with some libertarian ideas and principles." Dkt. 171, ¶ 38. In the absence of any evidence that either Roitenberg or Cohen made an effort to choose a successor who would serve the interests of the Federation, it follows that Fransen's appointment was a breach of fiduciary duty.

The Trustees include a line in their opposition brief that a claim for breach of fiduciary duty based on Fransen's appointment is untimely under the one-year limitations period for

Wis. Stat. § 701.1005(1), which applies to "a proceeding against a trustee for breach of trust." The Federation contends that § 701.1005(1) does not apply and that the claim is governed by § 893.57, which sets a three-year limitations period for a claim for breach of fiduciary duty. Neither side develops an argument in favor of one statute over the other, but even if the court assumes that § 701.1005 applies to this claim, it does not help the Trustees.

Under § 701.1005(1), the one-year limitations period does not begin to run until the trustee sends the beneficiary "a report that adequately disclosed the existence of a potential claim for breach of trust." The Trustees do not allege that they sent the Federation a report describing their process for choosing Fransen and they do not allege that the Federation otherwise had a notice of the process until after this lawsuit was filed. Because the Trustees have the burden on this issue, their silence is dispositive and the Federation is entitled to summary judgment on this claim.

## G. Prudent Investor Act

Wisconsin's Prudent Investor Act requires a "fiduciary" to "invest and manage assets as a prudent investor would, by considering the purposes, terms, distribution requirements, and other circumstances of the estate, trust, conservatorship, or guardianship. In satisfying this standard, the fiduciary shall exercise reasonable care, skill, and caution." Wis. Stat. § 881.01(3)(a). The Federation contends that the Trustees have violated this law by investing the trust's assets too conservatively, primarily in certificates of deposit and treasury notes.

The Trustees seek dismissal of this claim on a number of grounds, but the court need only consider one of them, which is that the statute of limitations has run. The Federation does

not deny that the one-year limitations period imposed by § 701.1005 applies to its claim under § 881.01, so the court need not consider that issue.

In support of a finding that the Federation had notice of this claim more than a year before the Federation filed it on May 23, 2016, the Trustees cite the following undisputed evidence:

- each year since 1981, the Trustees have provided the Federation the trust's financial statement, along with a copy of its income tax return and the Federation acknowledged receiving this information, Dkt. 160, ¶¶ 76–79;

- in 2014, after reviewing the trust's gift history since 2011, the Federation's CFO concluded that "[t]he precipitous decline in the grant amounts is a function of the extremely conservative investment strategy followed by the Trust," *id.* ¶ 152;

- in a letter dated May 15, 2015, the Federation's legal counsel wrote that he "see[s] a need for a better diversification in the current investments of the Trust and a portfolio more likely to deliver income in amounts sufficient to make a minimum required distribution," *id.* ¶¶ 153–54.

The Federation does not deny that it has been aware of the Trustees' investment strategy for years. Instead, the Federation says that the statute of limitations has not run because the Trustees are continuing to violate § 881.01 so long as they fail to comply with the requirements of statute and "[a] statute of limitations cannot bar a current and ongoing violation of the statute." Dkt. 147, at 27.

This argument would be persuasive if the Federation were pointing to new investment decisions the Trustees made after May 2015, but the Federation does not allege that the Trustees' investments have changed in any way since then. Under Wisconsin law, a plaintiff cannot defeat a statute of limitations defense simply by alleging that acts occurring before the limitations period continue to have harmful effects in the present. "[T]he key question under Wisconsin law is whether the plaintiff can point to a series of tortious acts; the fact that plaintiffs may have continued to suffer harm from one tortious act . . . does not stop the statute

of limitations from running." *McDonough v. WESTconsin Credit Union*, 97 F. Supp. 3d 1040, 1046 (W.D. Wis. 2015) (citing *Kolpin v. Pioneer Power & Light Co., Inc.*, 162 Wis.2d 1, 23, 469 N.W.2d 595, 604 (1991), and other cases). *See also Limestone Development Corp. v. Village of Lemont, Illinois,* 520 F.3d 797, 801 (7th Cir. 2008) ("The statute of limitations begins to run upon injury (or, as is standardly the case with federal claims, upon discovery of the injury) and is not tolled by subsequent injuries."). Because the Federation is alleging that acts occurring before the limitations period are continuing to have harmful effects in the present, the claim is untimely and the Trustees are entitled to summary judgment on this claim.[5]

## H. Other breaches of fiduciary duty

The court has discussed a number of breaches of fiduciary duty as they relate to the primary claims in this case. Both sides also raise claims for breach of fiduciary duty related to other issues. The elements of a claim for breach of fiduciary duty are: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that duty; and (3) the breach of duty caused the plaintiff's damage. *Berner Cheese Corp. v. Krug,* 2008 WI 95, ¶ 40, 312 Wis. 2d 251, 270, 752 N.W.2d 800, 809. The court will first discuss the Trustees' claim for breach of fiduciary against the Federation, followed by the Federation's other claims against the Trustees.

### 1. The Federation's alleged breaches

In their second amended complaint, the Trustees alleged that the Federation "failed in its fiduciary duty to faithfully follow the Trust's annual distribution instructions and restrictions." Dkt. 68, ¶ 68. In particular, the Trustees alleged that the Federation failed to distribute gifts in accordance with designated purposes and used at least some of the Trust's

_____

[5] This conclusion does not bar the Federation from raising a new claim in the event of any new investments by the Trustees that do not comply with the statute.

annual gift "to satisfy Federation obligations and commitments to other entities." *Id.* ¶ 70. In their summary judgment briefs, the Trustees say that there are factual disputes "regarding whether and to what degree [the Federation] misappropriated and/or misused Cohen Trust donations," but they seek summary judgment on the issue whether the Federation has a duty to "adhere to the terms of a restricted gift it has accepted." Dkt. 120, at 41. The Federation seeks summary judgment in full on this claim.

### a. Scope of the claims

A threshold question is what the proper scope of the claims are. In a report prepared by an accounting firm hired by the Trustees, four findings are discussed: (1) from 2005 to 2007, the Federation failed to distribute funds as directed to the United Jewish Communities (UJC); (2) in 2006, the Federation used parts of the trust's annual gift to satisfy obligations to the UJC; (3) in 2002, 2008, and 2012, the Federation misclassified trust funds as "unrestricted;" and (4) from 2008 to 2011, the Federation pooled restricted and unrestricted funds. The last two claims were not included in the complaint, so it is too late to raise them now. *Anderson*, 699 F.3d at 997. In any event, the Trustees do not identify any way in which they were independently harmed by the way the Federation classified or pooled funds, so the Trustees cannot prevail on those claims.

### b. Statute of limitations

The Federation says that the Trustees' breach of fiduciary duty claims are untimely because the statute of limitations on such claims is three years, Wis. Stat. § 893.57, and all of the alleged breaches occurred more than three years ago. But as the court stated in the order on the Federation's motion to dismiss, Dkt. 114, at 7, Wisconsin applies the "discovery rule," under which a tort claim does not accrue until "the date the injury is discovered or with

reasonable diligence should be discovered, whichever occurs first." *Gumz v. N. States Power Co.*, 2007 WI 135, ¶ 25, 305 Wis. 2d 263, 275, 742 N.W.2d 271, 276 (internal quotations omitted). According to the Trustees, they were not aware that the Federation was misusing the annual gifts because the Federation was lying to them. Preventing parties from benefitting from fraudulent conduct is one of the primary policies behind the discovery rule. *Merck & Co. v. Reynolds*, 559 U.S. 633, 644 (2010) (discovery rule is "needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from even knowing that he or she has been defrauded").

The Federation says that the Trustees have always had its annual statements, the same statements on which the Trustees are now relying to prove their claim, so the court should conclude that the Trustees did not act with reasonable diligence before bringing their claim. But the Trustees are not relying on just the statements; they have submitted a report from an accounting firm, which analyzed the statements and other documents before concluding that the Federation had not distributed the gifts as promised. The Federation does not suggest that the Trustees could have detected discrepancies in the statements simply by reviewing the statements themselves with an untrained eye. And because the Federation assured the Trustees that it had followed the Trustees instructions, a reasonable jury could find that the Trustees had no reason to dig deeper. *Hennekens v. Hoerl*, 160 Wis. 2d 144, 160, 465 N.W.2d 812, 819 (1991) (issue whether plaintiff exercised reasonable diligence is ordinarily question of fact for jury).

### c. Federation's duty to the Trustees

In its brief in opposition to the Trustees' motion for summary judgment, the Federation contends for the first time that it did not owe the trust or the Trustees any fiduciary duty. It

acknowledges that a beneficiary may have a fiduciary duty to the trust when, as in this case, the beneficiary receives a restricted gift. Dkt. 147, at 42. *See also* Dkt. 132-1, at 5 ("It is the Donor's intention that the trust be administered in a manner ensuring the attentiveness of the Federation to the trust's operations."). But the Federation contends that it has no duty in this case under the doctrine of merger of title. Because that is the only issue the parties discuss, the court will assume as the parties do that Wisconsin law recognizes that a beneficiary may have a fiduciary duty to trustees under some circumstances and the court will limit its consideration to the question whether the doctrine of merger of title should apply.

Neither side cites any Wisconsin law that discusses the merger of title doctrine, but the Federation cites *Restatement (Third) of Trusts* § 69 (2003), which states, "If the legal title to the trust property and the entire beneficial interest become united in one person, the trust terminates." As an example of this principal, the Federation cites *Denver Found. v. Wells Fargo Bank, N.A.*, 163 P.3d 1116 (Colo. 2007), but that case does not support the Federation's position. The court explained that "for the doctrine of merger to apply, the legal and beneficial interests must be completely coextensive. Conversely, if other equitable interests remain, the trust will not terminate." *Id.* at 1125.

In this case, it is obvious that "other equitable interests remain" besides the Federation's interests. As the trust agreement makes clear, the purpose of the trust is not to enrich the Federation, but to "benefit or carry out the [Federation's] charitable, education[al,] and religious purposes." Dkt. 132-1, at 2. And the Trustees retain some authority to determine which of those purposes the trust will support. Thus, the Federation is not free to do whatever it chooses with the money it receives. Accordingly, the court concludes that the merger doctrine does not apply.

### d. Minnesota Attorney General as a necessary party

In one paragraph in its opposition brief, the Federation contends that that the Minnesota Attorney General is an indispensable party under Federal Rule of Civil Procedure 19 as to the Trustees' breach of fiduciary duty claim. Under Rule 19(a), a party must be joined if "the court cannot accord complete relief among existing parties" without the missing party, if the missing party has an interest that could be impaired without joinder, or if failing to join the party would create "a substantial risk" of multiple or inconsistent obligations.

The Federation does not explain why it failed to raise this issue earlier, but even if the court assumes that the Federation may raise it now, the Federation has not shown that that the Minnesota Attorney General is a necessary party. To begin with, the Federation does not acknowledge the Rule 19(a) standard, let alone develop an argument under it. Instead, it says that the Minnesota Attorney General is a necessary party because "the Federation as a Minnesota charitable entity is accountable to the Minnesota Attorney General." Dkt. 147, at 43. But Rule 19 does not require joinder of any party to whom the Federation may be "accountable." Because the Federation does not identify any relief that the court cannot order without the Minnesota Attorney General or any way that a determination of the Trustees' rights would affect any potential action brought by the government, the Minnesota Attorney General does not have to be joined under Rule 19.

### e. Trustees' evidence of breach

In support of their breach of fiduciary duty claim, the Trustees rely primarily on a report prepared by an accounting firm in which it concluded after a review of the Federation's financial statements and other documents that the Federation had failed to distribute the Trustees' annual gift as the Federation represented that it had. The Federation does not directly

challenge the admissibility of the report or the conclusions in it. Instead, the Federation says that the report is "self-disqualifying" because it includes the following disclaimer: "The sufficiency of these procedures is solely the responsibility of the parties specified in this report. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this Agreed-Upon Procedures ('AUP') Report has been requested or for any other purpose." Dkt. 132-38, at 1.

The Federation omits the preceding sentence, which states that the firm prepared the report "in accordance with attestation standards established by the American Institute of Certified Public Accountants." *Id.* Although the firm did not represent that the procedures were sufficient under legal standards, the Federation does not point out any flaws with the procedures the firm used that would render the report inadmissible under the Federal Rules of Evidence. In the absence of that kind of argument, the court will not disregard the report simply because the authors declined to represent that the report was legally admissible, an issue that is beyond their expertise.

Alternatively, and more persuasively, the Federation cites letters from the UJC in which it acknowledged receiving donations from the Federation during the years that are in dispute. Dkt. 132-39. But those letters do not entitle the Federation to summary judgment. First, the letters do not address the Trustees' claim that, in 2006, the Federation used the trust's money to satisfy the Federation's own obligations to the UJC. Second, the letters may be persuasive evidence, but they do not establish as a matter of law that the Federation distributed the money as it promised. Rather, they establish that the evidence is disputed and that a trial is necessary to resolve the dispute.

### f. Trustees' requested declaration

As noted above, the Trustees seek summary judgment on the issue whether the Federation has a fiduciary duty to "adhere to the terms of a restricted gift it has accepted." Dkt. 120, at 41. Because it would be premature to issue a declaration on this claim before determining whether the Federation breached a duty to the Trustees, the court will deny this request.

## 2. The Trustees' alleged breaches

The Federation asserts various alleged breaches of fiduciary duty against the Trustees, both collectively and individually. The court has discussed a number of these claims in previous sections of the opinion, so it is unnecessary to discuss those claims again. Both sides seek summary judgment on all of these claims.

### a. Alleged breaches by the Trustees collectively

The Federation lists several alleged breaches by the Trustees collectively: (1) filing this lawsuit; (2) suing the Federation for breach of fiduciary duty; and (3) denying that they owe a fiduciary duty to the Federation. These are unusual claims because they all relate to legal positions taken by the Trustees and the Federation cites no authority in which any court found that similar conduct qualified as a breach of fiduciary duty. In the civil rights context, the Seventh Circuit has stated that "it will be the rare case in which conduct occurring within the scope of litigation constitutes retaliation" because "[d]efendants . . . must have some leeway to investigate possible defenses without undue fear of being subjected to additional liability in retaliation suits." *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075, 1077 (7th Cir. 1998). Uncabined, a rule that allowed a lawsuit or a claim to qualify as a breach of fiduciary duty would encourage an endless back-and-forth between litigants in which they contend that every adverse position

taken qualifies as a breach. Parties must have some latitude to assert their own view of the law, even if that view is incorrect.

A trustee has a right to bring disputes over the meaning of a trust instrument to court for resolution. Under some circumstances, a trustee may petition a court to modify a trust agreement to adapt the trust to changed circumstances while respecting the settlor's intent. Here, the parties had such different views of their respective obligations that allowing a court to adjudicate the dispute was not unreasonable. If the Trustees had not filed a lawsuit, it is likely that the Federation would have had to do so because it was clear that the parties had reached an impasse. As discussed above, the court has concluded that many of the Trustees' actions *leading up* to the lawsuit were breaches of fiduciary duty and their conception of their obligations was fundamentally flawed. But in the absence of any authority or even a developed argument, the court is not persuaded that this lawsuit was itself an independent breach. The same conclusion applies to the claim that the Trustees breached their fiduciary duty by suing the Federation for a breach of its fiduciary duty.

As for the claim that the Trustees breached the fiduciary duty by denying that they had a fiduciary duty to the Federation, the court has already ruled in the Federation's favor as to instances in which the Trustees' denial manifested into concrete harm. But the Federation does not explain how the denial itself, divorced from any conduct, inflicted harm. The court will grant summary judgment to the Trustees on this claim as well.

### b. Alleged breaches by Cohen

The Federation contends that Cohen breached her fiduciary duty by using money from the trust to pay an employee, Patricia Ellenson, for work that is not related to the trust.[6] It is

---

[6] The Federation also contends that Cohen breached her fiduciary duty by attempting to

undisputed that Ellenson performs accounting work for the trust, but the Federation contends that Cohen has allocated a disproportionate amount of Ellenson's salary to be paid by the trust.

In support of this claim, the Federation relies on the following evidence: (1) in 2015, the trust was charged more than $80,000 for Ellenson's work, half of her total salary, which encompasses several of the Cohen family's other charitable organizations; (2) the Federation's accounting expert says that the accounting work that Ellenson described in her deposition was worth approximately $20,000; and (3) although Ellenson testified in her deposition that she "do[es] everything" for the Cohen family, the Trustees have provided no evidence that Cohen has allocated any portion of Ellenson's salary to the personal errands that she performs.

In response, the Trustees submitted a new declaration from Ellenson, Dkt. 166, in which she describes additional accounting work that she performs for the trust and qualifies her deposition testimony that she "do[es] everything" for the Cohen family.[7] This conflicting evidence shows that there are genuine issues of material fact related to this claim, so summary judgment is inappropriate.

---

designate a gift to a synagogue "in [her] own honor" and by attempting to substitute an organization she created as the trust's new beneficiary. Dkt. 130, at 45. Because the court has concluded that the Trustees were not entitled to designate particular charities or substitute new organizations for the Federation, these actions will not take effect, so the Federation will not be harmed by them and they do not qualify as independent breaches of fiduciary duty. But they may be relevant to the question whether Cohen should be removed as a Trustee, an issue the court discusses below.

[7] The Trustees also say that the Federation's claim against Cohen is "hypocritical" because Federation has not complained about accounting expenses for one of its other supporting organizations. Dkt. 137, at 59–61. Neither side has a claim related to that organization, so the court has disregarded the argument.

### c. Alleged breaches by Kallina

In its counterclaim, the Federation identified two alleged breaches by Kallina: (1) creating a conflict of interest by seeking to substitute a new beneficiary in which Kallina has a financial interest; and (2) billing the trust approximately $200,000 in legal fees without "notice" or an "explanation as to why those fees were incurred." Dkt. 67, ¶ 81.

In its summary judgment materials, the Federation attempts to expand its claims against Kallina to cover a number of new issues, including challenges related to the way the Trustees retained Kallina's services, his ability to practice law in Wisconsin, and legal work related to the other alleged breaches. The court has disregarded the new claims, none of which are supported by a developed argument. *Anderson*, 699 F.3d at 997.

The court turns to the claims in the Federation's counterclaim. As to the alleged conflict of interest, the substitution of beneficiary never took place and the Federation has not identified any harm it suffered, so the court will dismiss this claim. But evidence of an attempt of self-dealing could be relevant in determining whether the Trustees should be removed, an issue discussed below.

The Federation seeks summary judgment on the claim related to Kallina's legal fees, but the Federation did not adduce evidence in support of that claim in its opening brief or proposed findings of fact, so the only question is whether the Federation adduced sufficient evidence in its opposition materials to defeat the Trustees' motion for summary judgment on this claim.

In its supplemental proposed findings of fact, Dkt. 161, the Federation listed nearly two dozen of Kallina's billing entries that appear on their face to include work unrelated to the trust but Kallina nonetheless billed to the trust. Dkt. 161, ¶ 24. In response, the Trustees point out that some of the entries are listed as "no charge." Dkt. 150-5. But for many of the other

entries, the Trustees' explanation is that the work was related to the trust, even though the entries clearly state that the Kallina was performing work for many other Cohen entities as well. The Trustees do not say explain why it would be appropriate to charge the trust for legal matters related to other entities and they do not allege that the work Kallina performed for the various entities overlapped completely. Even if there was overlap, the Trustees do not explain why it would be appropriate to charge the trust the full amount rather than divide the bill among the entities. For these reasons, summary judgment is not appropriate on this claim.

### d. Alleged breaches by Fransen

As it did with the other Trustees, the Federation raises a number of complaints about Fransen throughout its briefs, but the only issue that is both developed in the Federation's briefs and included in the Federation's counterclaim is the claim that Fransen breached his fiduciary duty by failing to adequately review the charities the trustees designated in the Trustees' 2015 gift. Because the court has concluded that the Trustees did not have the right to designate particular charities in 2015, those designations will not take effect, so the Federation cannot be harmed by the breach. Again, however, this conduct could be relevant to a determination whether Fransen should be removed as a trustee.

### e. Statute of limitations

In their brief in opposition to the Federation's summary judgment motion, the Trustees contend that "many" of the Federation's breach of fiduciary duty claims are barred by the one-year statute of limitations in Wis. Stat. § 701.1005(1). But the Trustees do not develop an argument that the Federation had adequate notice of the claims against Cohen and Kallina more than one year before filing those claims, so it is unnecessary to consider this issue in the context of the parties' summary judgment motions. But if the Trustees intend to assert a statute

of limitations of defense at trial as to the claims against Cohen and Kallina, the parties will need to resolve whether the statute of limitations in § 701.1005 (governing claims for a "breach of trust") or § 893.57 (governing claims for breach of fiduciary duty) applies, perhaps in a motion in limine.

## I. Requested relief

As a remedy for the Trustees' breaches, the Federation asks the court to remove the Trustees from office under Wis. Stat. §§ 701.706 and 701.1001(2)(g). The Federation also seeks attorney fees under Wis. Stat. § 701.1004(1), which allows a court to award fees and other expenses "as justice and equity may require" in a case about the administration of trust. Both sides seek declarations that their rights were violated.

The court will refrain from awarding declaratory or injunctive relief at this time on any of the parties' claims. Although the court has concluded that each side is entitled to summary judgment on some issues, it would be premature to award relief before resolving the remaining issues in dispute. Once the trial has concluded, the court will consider the appropriate scope of declaratory and injunctive relief and the Federation can renew its motions for fees and to remove the trustees if it wishes to do so.

## J. Scheduling

The court stayed the remaining pretrial deadlines pending a decision on the parties' motions for summary judgment. Dkt. 187. The court will reset the deadlines as follows:

- Motions in limine and pretrial disclosures: January 8, 2018

- Responses to motions in limine and objections to pretrial disclosures: January 16, 2018

- Final pretrial conference: January 24, 2018, at 4:00 p.m.

The January 29, 2018 trial date remains the same.


## MOTION TO COMPEL

The Federation has filed a motion in which it seeks to compel compliance with: (1) a request to the Trustees to produce unredacted legal invoices from Kallina for dates after April 2016; (2) a discovery subpoena served on Kallina & Associates, LLP (Kallina's law firm); and (3) a notice to the trust to produce a witness for a deposition under Rule 30(b)(6). The last two discovery requests cover a wide range of topics, but the only topics the Federation discusses in its brief are testimony regarding the invoices for legal work charged to the trust and testimony related to Patricia Ellenson's September 2017 declaration, so the court will limit its consideration to those issues.

The Trustees' only objection to producing the invoices is that they are not relevant to the case, but that is obviously incorrect. The invoices the Federation seeks are relevant to two issues that still need to be decided: (1) whether and to what extent Kallina breached its fiduciary duty to the Federation by charging the trust for work that was not related to the trust; and (2) whether Kallina should be removed as a trustee. Accordingly, the court will direct the Trustees to produce the unredacted invoices.

As for the testimony about the invoices and the work that Ellenson performed, the Federation wants to obtain that testimony through a deposition of the trust under Rule 30(b)(6), but the Federation has not shown that it is entitled to one. Regardless whether a trust can be subject to a Rule 30(b)(6) deposition as a general matter, the trust is not a party to the case and the Federation has not identified any reason why testimony from individual witnesses does not suffice.

It may be that the Federation is requesting a Rule 30(b)(6) deposition because it has already deposed each of the Trustees and is not entitled to second deposition without leave of court or a stipulation from the Trustees. Fed. R. Civ. P. 30(a)(2)(A). But the purpose of Rule 30(b)(6) is obviously not to give a party a vehicle for deposing the same witness a second time.

In any event, the Trustees have agreed to allow Kallina to be deposed about his September 2017 declarations, in which he discusses the billing entries at issue in this case. Dkt 183, at 15. The Trustees have also agreed to a second deposition of Ellenson. Dkt. 182-12. But the Trustees want to limit the depositions to "the amount of unused time" for those witnesses. *Id.* This would be a significant limitation, as it appears that both witnesses were already deposed for a full day. Dkt. 109 and Dkt. 110. Because the depositions relate to information that the Trustees withheld until after both witnesses were deposed, the court will not impose such a time limitation. But because the topics for both witnesses are limited, the Federation should not need a full day. The court will allow three hours for each witness.

The parties devote much of their briefs on this motion to the question whether the attorney-client privilege applies to communications between Kallina and the Trustees, but they do not tie their debate to the discovery requests at issue. In the court's view, the Federation should not need to ask questions about the substance of any legal advice Kallina provided to the trust or any other entity because the only relevant questions are related to whether the billing entries at issue were appropriately billed to the trust. In any event, because Kallina already testified about that issue in his declaration, the Trustees cannot assert the privilege as to that testimony. Fed. R. Evid. 502(a); Wis. Stat. § 905.11.

ORDER

IT IS ORDERED that:

1. The Trustees' motion to strike the Federation's "second supplemental proposed findings of fact," Dkt. 174, is GRANTED.

2. The Trustees' motion for summary judgment, Dkt. 119, is GRANTED and the Federation's motion for summary judgment, Dkt. 129, is DENIED as to the following issues and claims:

   a. whether the Trustees violated the Wisconsin Prudent Investor Act;

   b. whether the Trustees breached their fiduciary duty to the Federation by: (1) filing this lawsuit; (2) suing the Federation for breach of fiduciary duty; or (3) denying that they owe a fiduciary duty to the Federation;

   c. whether Kallina breached his fiduciary duty to the Federation in any way other than by improperly billing the trust for legal services;

   d. whether defendant Fransen breached his fiduciary duty to the Federation.

3. The Federation's motion for summary judgment, Dkt. 129, is GRANTED and the Trustees' motion for summary judgment, Dkt. 119, is DENIED as to the following claims and issues:

   a. whether the Trustees have authority to direct the Federation to distribute the annual gift to particular charities under the terms of the original trust agreement;

   b. whether the Trustees are entitled to substitute a new trust beneficiary in place of the Federation;

   c. whether the Trustees were entitled to amend the agreement to allow the Trustees to designate particular charities;

   d. whether the Trustees were entitled to amend the agreement remove the reference to a "Federation Trusteeship and the Federation's right to appoint a successor trustee in some circumstances;

   e. whether the Trustees were entitled to amend the agreement to allow the Trustees to elect to become a private foundation;

   f. whether the appointment of Frederic Fransen as a trustee violated the Federation's rights;

g. whether the Federation breached its fiduciary duty to the Trustees by (1) misclassifying trust funds as "unrestricted" in 2002, 2008, and 2012; and (2) pooling restricted and unrestricted funds from 2008 to 2011.

4. The Federation's motion for summary judgment, Dkt. 129, is DENIED on the following claims and issues:

   a. whether the Federation breached its fiduciary duty to the Trustees from 2005 to 2007 by failing to distribute funds to the United Jewish Communities as it represented to the Trustees;

   b. whether the Federation breached its fiduciary duty to the Trustees by using parts of the trust's annual gift to satisfy obligations to the UJC in 2006;

   c. whether the Trustees should be removed from office;

   d. whether the Federation is entitled to costs and fees under Wis. Stat. § 701.1004.

5. Both sides' summary judgment motions are DENIED on the following claims and issues:

   a. whether the Trustees are entitled to a declaration that the Federation is required to "adhere to the terms of a restricted gift it has accepted";

   b. whether Cohen breached her fiduciary duty to the Federation by charging the trust for an employee's work that was unrelated to the trust;

   c. whether Kallina breached his fiduciary duty to the Federation by improperly billing the trust for legal services.

6. The Federation's motion to compel discovery, Dkt. 178, is GRANTED as to its requests to (1) produce unredacted legal invoices from Kallina for dates after April 2016; and (2) depose Kallina about those invoices and any issues relating to the Kallina's September 2017 declarations; (3) depose Ellenson about issues related to her September 2017 declarations. The motion is DENIED in all other respects

7. The parties shall adhere to the new pretrial deadlines set forth in the opinion.

Entered December 14, 2017.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge